945 So.2d 540 (2006)
Etavius CARLYLE, Appellant,
v.
STATE of Florida, Appellee.
No. 2D04-4412.
District Court of Appeal of Florida, Second District.
November 29, 2006.
Rehearing Denied January 11, 2007.
*541 James Marion Moorman, Public Defender, and Pamela H. Izakowitz, Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Timothy A. Freeland, Assistant Attorney General, Tampa, for Appellee.
VILLANTI, Judge.
Etavius Carlyle appeals his convictions for attempted second-degree murder and four counts of sexual battery with a deadly weapon or force causing injury. Carlyle contends that the trial court erred in not acquitting him on three of the sexual battery counts because only one act occurred and that the trial court abused its discretion in two evidentiary rulings. We affirm.
The State's main witness at trial, the twenty-eight-year-old victim, testified that on August 6, 2003, she asked her former boyfriend to take her to a certain church because she wanted to attend an AA meeting. Upon arrival, it was determined that there was no AA meetingthus revealing *542 the victim's true motive: i.e., to be in an area where she could obtain drugs. The two argued over the victim's plan to find and use drugs. The victim got out of the former boyfriend's car and walked away.
Soon thereafter, the victim entered a vehicle driven by Edward Cook, who had pulled over to assist and offer her a ride.[1] The former boyfriend, having followed the victim, approached Cook, who was wearing a security guard outfit, and informed him that the victim had just been released from a hospital following a drug overdose. The former boyfriend said, "Please take her to a safe place. She won't get in the car with me. I am afraid she is going to use [drugs]." Cook replied, "Don't worry. I will take good care of her." Then, the victim and Cook drove off.
Cook told the victim that his name was "Shane." He had a bottle of vodka that he shared with the victim. The victim testified that she had $20 on her and that she was looking to get high. Cook told her that he knew where they could get crack cocaine, which is what she wanted. They went to a house already occupied by several other people. One of the men took Cook and the victim to a second house where they purchased drugs. The three returned to the first house and went inside to get high.
Back at the first house, the liquor and the recently obtained crack cocaine were shared and consumed by the victim and four men. The victim testified that there was no discussion with Cook regarding an exchange of sex for money or drugs. At some point, Cook introduced the victim to "Tay," whom the victim later identified as Carlyle.
When the drugs were gone, Cook, Carlyle, and the victim left in Cook's truck to buy more vodka. They drank the vodka and discussed where they would go to party. Cook produced more crack cocaine from under the seat of his truck, which the three shared. The victim testified that, at this point, she was not ready to go home. She also testified that there was no agreement for sex between her and either man, but both men were making "kind of rude comments." Cook said that he knew a guy in Clearwater who had drugs, and the trio headed in that direction.
According to the victim's testimony, as she, Cook, and Carlyle were driving toward Clearwater, Cook pulled off the causeway. Once the truck pulled off the road, the two men violently beat and sexually battered the victim. Eventually, the victim was able to get away, and she crawled, naked, onto the highway. From there, she saw Cook's vehicle speed off. Police found her and had her transported by ambulance to the hospital. Cervical and vaginal swabs taken from the victim contained semen that matched Carlyle's DNA profile.
On cross-examination, the trial court sustained objections when the victim was asked by the defense counsel whether it was unusual for her to get into a car with a strange man and whether it was something she had done before. The victim testified that the word "party" meant doing drugs and nothing else. When asked if there was any talk about going into the back bedroom of the first house, she stated:
A. There was a joke that it was the VIP room.
Q. What did that mean to you?

*543 A. I know what VIP stands for. I just kind of chuckled it off.
Q. What did it mean to you?
A. I said I don't know about that. And then the conversation moved on into well where are we going to go.
Q. What does the VIP room mean to you?
A. Well, I am not accustomed to hanging out in someone's bedroom in someone's house that I don't know who they are. I was not agreeable to that.
The victim admitted that she had two prior felony convictions.
Carlyle presented a different version of the events in his trial testimony. He testified that he met the victim, through Cook, at the first house. When he entered the house, the occupants, including Cook and the victim, were "sitting there getting high." Carlyle testified that the victim told him that she wanted to party. According to Carlyle, "We was [sic] in the back room and we came to some agreements. She wanted drugs in exchange for sex and I agreed to it. She agreed to it and it happened." Later, after he came out of the bedroom, Carlyle observed an argument between Cook and the victim. Carlyle then left the house and went to the farmer's market. He testified that he did not know what happened to either Cook or the victim. He admitted that he had seven prior felony convictions.
Carlyle first argues on appeal that the trial court erred in not granting a judgment of acquittal for three of the four sexual battery counts based on his assertion that the offenses arose from a single criminal episode. We reject this argument because the victim testified to four acts of sexual battery that were distinct and temporally separated. The victim described being forced to perform oral sex, followed by vaginal sex, followed by another act of oral sex, and, finally, anal sex. Because there was time between each penetration to reflect and form a new criminal intent, four convictions were appropriate. See Schwenn v. State, 898 So.2d 1130 (Fla. 4th DCA 2005); Saavedra v. State, 576 So.2d 953 (Fla. 1st DCA 1991), aff'd, 622 So.2d 952 (Fla.1993).
Carlyle next argues that the trial court erred in excluding evidence of the victim's prior sexual conduct. Carlyle filed a motion seeking permission to introduce evidence of the victim's prior arrest for prostitution and her admission that she had acted as a prostitute in the past. Specifically, in a pretrial deposition the victim admitted having been arrested for prostitution by an undercover officer at an adult club and admitted engaging in prostitution on other occasions when she worked as an escort. She also admitted that it was not unusual for her to get into cars with strangers for the purpose of partying, but the partying never involved sex. The defense argued that these prior activities should be admitted to demonstrate that the victim consented to have sex with Carlyle.
The defense motion also sought to admit evidence that the victim had recently accused another person of sexual battery. The defense presented the trial court with a "Sexual Battery History & Physical Examination" report prepared by a crisis center nurse in June 2003 in which the victim reported being raped by a man she met at a hotel where she was staying temporarily. The report stated her account of the incident as follows:
Woke up this AM & he was there. This is a hotel room. He had beer bottle in her vagina. Said he had sex with her during the night. Got up took a shower. When she got out man was gone & purse gone. Just met at hotel. Staying at hotel here temporarily. Earlier *544 he approached her at laundry room. Asking directions. Had bottle of rum. Had one drink at pool. Then went to bar. He left and she doesn't remember anything until she woke up this AM.
The report also stated that the victim had bruises on her arms, legs, and breasts and bite marks on her buttocks. The defense argued this latter episode was admissible to establish a pattern that the victim engaged in sexual activity with strangers and "risqué" sex.
The trial court denied the defense motion based on the court's finding that Carlyle had not established a sufficient pattern between this case and the prior specific acts of the victim. The court stated that just showing that the victim exchanged sex for money in the past was not enough similarity to remove the rule of exclusion required by the rape shield law"Specific instances of prior consensual sexual activity between the victim and any person other than the offender shall not be admitted into evidence in a prosecution under s. 794.011." § 794.022(2), Fla. Stat. (2004). We conclude that the trial court did not abuse its discretion in excluding this evidence.
The trial court's ruling concerning the inadmissibility of the victim's prior activity as a prostitute is reviewed for an abuse of discretion. See Docekal v. State, 929 So.2d 1139, 1142 (Fla. 5th DCA 2006). Here, there were insufficient similar facts developed to show a pattern of conduct mandating admissibility of the victim's prior prostitution/escort employment. "It is within the sound discretion of the trial judge to determine the admissibility of evidence, and the trial judge's ruling on such an issue will not be disturbed on appeal absent a showing of an abuse of discretion." Penalver v. State, 926 So.2d 1118, 1132 (Fla.2006). The record supports the trial court's ruling.
Florida's rape shield law, section 794.022(2), further provides that
evidence [of prior sexual activity with others] may be admitted if it is first established to the court in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.
(Emphasis added.) The victim's prior prostitution conduct, escort activity, and her misdemeanor prostitution conviction in an adult lounge sting operation were not sufficiently factually similar to the incidents here such that it was an abuse of discretion to exclude them. At the pretrial hearing, the defense asserted that "prostitution is prostitution," meaning that pursuant to section 794.022(2), the prior illicit activity was "conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent" and hence admissible. Clearly, such a generalized concept ("prostitution is prostitution") is insufficient to show a pattern of conduct or behavior. Even if the victim's prior conduct had been more fully developed, it is clear there were sufficient dissimilarities to the charged offenses. Hence, sufficient relevance could not be established so as to survive the limitations of Florida's rape shield law.
In Robinson v. State, 575 So.2d 699 (Fla. 1st DCA 1991), a case where the defense was consent, the court discussed applying the rape shield law to limit cross-examination.
We agree with appellant's basic premise that evidence of prostitution may well have a bearing on the issue of consent where the defendant's defense is that the sexual encounter which he had *545 with the victim was in connection with an act of a prostitution. Roberts v. State, 510 So.2d at 892; State v. Jenkins, 456 So.2d 174 (La.App. 2d Cir. 1984); State ex rel. Pope v. Superior Court, 113 Ariz. 22, 545 P.2d 946, 94 A.L.R.3d 246 (1976). Should a defendant make a sufficient showing through an offer of proof on the record, or by other appropriate means, that the evidence of prostitution bears materially on the issue of consent, and that without the opportunity to elicit that evidence the defendant's ability to present a defense will be critically hampered, then the trial court should engage in a balancing test to weigh the probative value of the evidence against the unfair prejudice to the victim and the state's case to determine if it should be admitted. The trial court's decision will be reviewed using an abuse of discretion standard. See, e.g., State ex rel. Pope v. Superior Court, supra, and Holloway v. State, 695 S.W.2d 112 (Tex.App.2d Dist.1985).
Id. at 702-03.
The above demonstrates that the protection of the rape shield law can only be lifted if the defense makes two sufficient showings of materiality: (1) evidence of prostitution bears materially on whether consent was given in the charged offense(s), and (2) the defense's ability to present a defense will be otherwise materially hampered. Even if these showings are made, exclusion is still permitted if the trial court finds the evidence's probative value does not outweigh unfair prejudice to the victim and the State's case.
"[E]vidence of prostitution may well have a bearing on the issue of consent where the defendant's defense is that the sexual encounter which he had with the victim was in connection with an act of prostitution." Robinson, 575 So.2d at 702. However, "[t]he few isolated instances presented did not present a `pattern of conduct or behavior.'" Winters v. State, 425 So.2d 203, 204 (Fla. 5th DCA 1983) (quoting Hodges v. State, 386 So.2d 888, 889 (Fla. 1st DCA 1980)). The victim's "pattern must be so distinctive and so closely resemble the defendant's version of the encounter that it tends to prove that the complainant consented to the acts charged." Kaplan v. State, 451 So.2d 1386, 1387 (Fla. 4th DCA 1984). Here, the trial court found that a pattern had not been shown. Furthermore, "although the victim may have consented to the same type of sexual activity, . . . no evidence was presented to show that she consented to violence or physical abuse." State v. Pancoast, 596 So.2d 162, 164 (Fla. 2d DCA 1992). Because the prior conduct, individually or collectively, was not sufficiently similar to establish a pattern similar to the victim's conduct relating to the charged offenses, its admission would only go to show "reputation evidence relating to a victim's prior sexual conduct"which is specifically prohibited by section 794.022(3). Notably, the protection of the rape shield law does not diminish based upon the victim's past or present occupation but only when a sufficient showing of similarity exists.
Here, the victim's admission that she had previously engaged in prostitution does not support the defense that she had engaged in consensual sex with Carlyle for several reasons. For example, there was no evidence that the victim's prior prostitution involved sex for drugs or involved someone she met for the first time at a party, as opposed to her claim of prior escort employment. Moreover, there was no claim that the victim initially came into contact with Carlyle and Cook while she was engaged as a prostitute or an escort. The prior evidence as noted by the trial court "was more working out of an escort *546 service." The defense argued "prostitution is prostitution" and this is enough to establish the pattern necessary for admissibility. The difficulty with this argument is that it is too generic and at best, as noted by the trial court, does not "prove or disprove consent in this issue." In other words, there were no details developed concerning the prior prostitution acts that distinctively resembled the victim's conduct, under Carlyle's version, that would lead to the conclusion that consent occurred.
"It is important to note that Florida's rape victim shield statute does not exclude evidence that is otherwise admissible. Section 794.022(2), Florida Statutes (1983), is merely a codification of this jurisdiction's rule of relevance as it applies to the sexual behavior of a sexually battered victim." Kaplan, 451 So.2d at 1387. While here the trial court limited the use of "labels like prostitution," the court specifically allowed defense counsel to ask the victim "whether or not she was to be paid for sex." Defense counsel failed to pursue this line of allowed questioning. The defense was not hampered as the jury was otherwise presented with a picture of a victim who was a manipulator, an addict, a failure at rehabilitation, a convicted criminal, and a person unafraid to party with strangers.
As to the prior sexual battery incident, the trial court properly ruled the June 2003 sexual battery report inadmissible because the specific facts of that incident do not relate to the consent defense here. "Specific instances of prior consensual sexual activity between the victim and any person other than the offender shall not be admitted into evidence in a prosecution under s. 794.011." § 794.022(2). Moreover, this prior rape report was never shown to be false. Even assuming this occurrence somehow was a result of consensual sex, it does not alter the necessity that a pattern be shown before this evidence can be deemed admissible.
The term "pattern" denotes repetitive or frequent conduct. . . . [T]he pattern must be so distinctive and so closely resemble the defendant's version of the encounter that it tends to prove that the complainant consented to the acts charged or behaved in such a manner as to lead the defendant reasonably to believe that the complainant consented.
Kaplan, 451 So.2d at 1387 (citations omitted). Because this evidence did not establish a pattern supporting Carlyle's claim that his semen was a result of consensual sex with the victim earlier in the evening, there was no abuse of discretion by the trial court in not admitting the evidence.
Finally, Carlyle claims the trial court erred by excluding evidence of the victim's incarceration at the time of the trial. Although the victim was incarcerated at the time of trial as a probation violator, the State was given permission to dress the victim in ordinary clothing so that the jury would not see her in a jail uniform. The trial court also ruled that the defense could not question her as to being in jail at the time of trial due to the then-pending felony probation violation. The State concedes on appeal that the fact that a witness is in jail for a pending probation violation is generally admissible to show bias. See Watts v. State, 450 So.2d 265 (Fla. 2d DCA 1984). Indeed, "the defendant has the absolute right to fully cross-examine adverse witnesses to discredit them by showing bias, prejudice, interest, or possible ulterior motive for testifying. This is particularly so where a key witness is being examined." 450 So.2d at 267.
"Denial of effective cross-examination in such circumstances constitutes constitutional *547 error requiring reversal unless the error is harmless beyond a reasonable doubt." 450 So.2d at 268. Under the facts of this case, we agree with the State's contention that the trial court's restriction of defense cross-examination of the victim witness on this matter was harmless error. See, e.g., Millett v. State, 460 So.2d 489, 493 (Fla. 1st DCA 1984) ("When faced with a situation in which harmless error may apply, our task is to determine whether `the error committed was so prejudicial as to vitiate the entire trial.'" (quoting Cobb v. State, 376 So.2d 230, 232 (Fla.1979))). Although the victim was facing a violation of probation, the jury was informed of the victim's prior criminal convictions, and there was no reason advanced as to why her incarceration at the time of trial motivated her to lie at the time of the offense. The record clearly demonstrates that the defense was provided ample opportunity to challenge the victim's credibility. The State did not attempt to capitalize on the trial court's harmless error or otherwise paint the victim as a saintly figureor something she clearly was not.[2] Thus, there is no reasonable probability that the error contributed to Carlyle's conviction. See Smothers v. State, 513 So.2d 776 (Fla. 1st DCA 1987).
Affirmed.
ALTENBERND, J., Concurs.
FULMER, C.J., Dissents with opinion.
FULMER, Chief Judge, Dissenting.
I respectfully dissent. In my view, the trial court reversibly erred in excluding relevant evidence bearing on the victim's credibility and Carlyle's defense of consent to the sexual battery charges.
Carlyle's defense at trial was that the victim had engaged in consensual sex with him in exchange for drugs at a crack house, after which he left the house and had no further contact with the victim. He advanced no theory as to how she was later beaten. At a pretrial hearing on Carlyle's Motion to Allow Defense to Introduce Evidence of the Alleged Victim's Prior Sexual Conduct, the evidence of the victim's prior activities as a prostitute was discussed. The defense requested the court to allow it to bring up at trial the fact that the victim had been a prostitute in the past, which she candidly admitted in her deposition testimony. In response to the defense motion, the State argued that the evidence of the victim's activity as a prostitute was insufficiently similar to the facts of the current case to render it admissible under the rape shield statute.
In support of the State's argument, the prosecutor referred to the police report for the victim's prostitution conviction. That report indicated that an officer responded to a call for potential prostitution. The officer followed the victim into the Fantasy Land adult theater. The officer engaged the victim in a conversation about wanting to watch a movie with her. They went to a private booth to watch a movie and the victim agreed to engage in an oral sex act in exchange for $50 before she was arrested.
The prosecutor argued that the Fantasy Land incident had no similarities to this case because there were no drugs or violence involved. And, she argued that the victim had never been prosecuted for the other instances of prostitution that she referred to during her deposition. The prosecutor asserted that the rape shield *548 law exempts from trial general information that the victim has engaged in prostitution.
The defense attorney explained the relevance of the prostitution evidence in an exchange with the trial court:
The Court: . . . [A]ssume I rule against you on your motion[,] are you saying that's going to preclude you from taking the position on behalf of your client that whatever sex occurred between your client and the alleged victim was consensual?
[Defense Counsel]: It does not prohibit him from doing so, but you are eliminating now what I would consider exculpatory evidence to corroborate his theory that this was consensual not because he is Michael Jordan and all the girls are after him. Why is there this sexual encounter between total strangers?
Let me also make the point that it has not been proven that the implantation of the DNA of Mr. Carlyle's semen in the alleged victim actually occurs at the event of the beating nor has it been established that Mr. Carlyle is present at the time of the beating.
The Court: That's for the jury to decide.
[Defense Counsel]: Right. The rape counselor nor can anybody else give us a pinpoint time of when that DNA was implanted other than a certain span of 72 hours. The theory exists that there could have been a sexual encounter on the streets[,] at Fantasy Land, over an escort service. However prostitution is done. . . . It shows a pattern of sexual activity with strangers. If the theory exists[,] that could have happened with Mr. Carlyle[,] and then she gets into some other situation with someone else in which case she is beaten [by,] I don't know[,] a boyfriend or a pimp and then who does she blame? Oh, Mr. Carlyle. . . . [I]f you preclude a jury from hearing this type of evidence then they don't hear the whole story.
In Roberts v. State, 510 So.2d 885, 892 (Fla.1987), the court recognized that the rape shield statute would have to give way if its application interfered with a defendant's confrontation rights or otherwise operated to preclude the defendant's right to present a full and fair defense. In Roberts, the trial judge excluded evidence of a rape victim's conversation with her assailant in which she discussed having worked as a prostitute. In upholding this ruling, the supreme court stated, "Although this testimony would likely be relevant to a defense of consent, Roberts does not claim consent; he has consistently maintained he did not have sexual relations with [the victim]." Id. at 892 (emphasis added).
In Robinson v. State, 575 So.2d 699 (Fla. 1st DCA 1991), the court recognized the due process implications in applying the rape shield statute to limit cross-examination.
A defendant's right to confront and cross-examine witnesses and to call witnesses in his own behalf are essential to due process. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). A statute prohibiting evidence of a certain class, even if for the worthy purpose of preventing witnesses from suffering humiliation on the stand, may not limit the Sixth Amendment right to confrontation guaranteed all defendants. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (shield law designed to preserve anonymity of juvenile defender set aside when it ran afoul of defendant's right of confrontationdefendant should have been permitted to show bias of state's crucial witness by eliciting testimony concerning witness's juvenile record). In Davis, the United States Supreme *549 Court balanced the defendant's right of confrontation against the state's policy of protecting the record of a juvenile offender and determined that under the circumstances of that case, the shield law should yield.
Id. at 702-03.
Here, by excluding all evidence of the victim's admitted history of prostitution, Carlyle's ability to present a full and fair defense on the consent issue was critically hampered. Carlyle was also hampered in his ability to impeach the victim's credibility. When asked if there was any talk about going to the back bedroom at the crack house, the victim answered, "I am not accustomed to hanging out in someone's bedroom in someone's house that I don't know who they are." It is likely that the jury may have weighed this answer differently had Carlyle's counsel been allowed to next ask the victim if she had engaged in prostitution in the past. The majority states that "the court specifically allowed defense counsel to ask the victim `whether or not she was to be paid for sex'" and then observes that "[d]efense counsel failed to pursue this line of allowed questioning." It is understandable that defense counsel did not ask the victim whether or not she was to be paid for sex because the "line of questioning" that would need to be pursued if she answered "No" was expressly prohibited by the trial court. As defense counsel explained at the motion hearing, asking the victim if she was going to be paid for sex without the opportunity to also ask if she previously worked as a prostitute will make the jury think that defense counsel was simply trying to malign the victim's character, and "the jury is going to want to convict me because they are going to say here is this poor woman and the lawyer is beating her up." A weighing of the unfair prejudice to the victim against the probative value of the evidence dictates in favor of allowing the defense to present the jury with a complete picture of the victim and her admitted history of prostitution.
I further conclude that the trial court committed reversible error when it excluded evidence of the victim's incarceration at the time of the trial. The record reflects that at the time of Carlyle's trial the victim was in jail awaiting a violation of probation hearing on three cases which encompassed five felony charges. The defense was entitled to question the victim about the fact that she was a jail inmate awaiting a hearing on a probation violation to show her possible bias, motive, or self-interest. Breedlove v. State, 580 So.2d 605, 608 (Fla.1991); Torres-Arboledo v. State, 524 So.2d 403, 408 (Fla.1988). In Breedlove, 580 So.2d at 608, relying on Fulton v. State, 335 So.2d 280, 283-84 (Fla.1976), the court discussed why a defendant has an absolute right to bring out the fact that a witness for the State is presently under actual or threatened criminal charges. For instance, in this case, the victim may have believed that she would be a more sympathetic person to the court and prosecutors in her own pending case with the defendant convicted of the brutal rape against her.
The majority appears to recognize the error in restricting the cross-examination of the victim as to her pending cases but concludes that the error is harmless. I disagree that the error can be considered harmless. Because the defendant admitted that he had sex with the victim but claimed that he was not involved in the victim's beating, the case came down to a credibility determination on the question of when the intercourse occurred as well as whether it was consensual. Therefore, it was crucial for the defense to be able to bring out all the information that might allow the jury insight into the victim's *550 credibility. It is evident from the State's closing argument that the prosecutor wanted the jury to believe that it had a complete picture of the victim. This trial was a classic swearing match between the victim and Carlyle. Therefore, any evidence that would have shown bias on the part of the victim could have influenced the jury's perception of her credibility. If the jury had not chosen to believe the victim and had given any credence to the defendant's version of events, Carlyle would have been acquitted on all counts. The majority states, "The record clearly demonstrates that the defense was provided ample opportunity to challenge the victim's credibility." I can find no instances of this "ample opportunity" in the record.
The harmless error analysis is governed by State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). The majority opinion relies on a case, Millett v. State, 460 So.2d 489 (Fla. 1st DCA 1984), which pre-dates DiGuilio. The supreme court explained the harmless error analysis in DiGuilio:
Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.
491 So.2d at 1139. Generally, when a case comes down to a swearing match between a witness's version of events and the defendant's version, the improper restriction of cross-examination on matters bearing on the witness's credibility cannot be considered harmless. Michael v. State, 884 So.2d 83, 85 (Fla. 2d DCA 2004); Chadwick v. State, 680 So.2d 567, 568 (Fla. 1st DCA 1996); Jones v. State, 678 So.2d 890, 893 (Fla. 4th DCA 1996); see also United States v. Alexius, 76 F.3d 642, 646-47 (5th Cir.1996) (rejecting government's harmless error argument where trial court abused its discretion in refusing to allow the defendant to cross-examine witness regarding his pending felony charge). I would therefore reverse Carlyle's convictions and remand for a new trial.
NOTES
[1] Cook was also charged with offenses arising from this episode. His charges and Carlyle's were severed prior to Carlyle's trial.
[2] In closing, the State even pointed out that "[the victim] in no way tried to minimize what happened. Not even minimizing how she in essence put herself into this most dangerous situation."