# Third District Court of Appeal

## State of Florida

Opinion filed July 05, 2018.
Not final until disposition of timely filed motion for rehearing.

————————————

No. 3D16-423
Lower Tribunal No. 11-27832A

————————————

**Kevon George,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Marisa Tinkler-Mendez, Judge.

Aubrey Webb, for appellant.

Pamela Jo Bondi, Attorney General, and Joanne Diez and Marlon Weiss, Assistant Attorneys General, for appellee.

Before ROTHENBERG, C.J., and SUAREZ and SCALES, JJ.

ROTHENBERG, C.J.

The defendant appeals his various convictions and sentences following a

jury trial. The defendant's claims on appeal are that the trial court: (1) abused its discretion by denying his motion for a mistrial due to the prosecutor allegedly pre-trying the case during voir dire; (2) abused its discretion by granting the State's motion in limine and ruling that the defense could not cross-examine the lead detective as to his pending criminal charges; (3) abused its discretion by allowing the State to introduce a statement made by the homicide victim just before he died; and (3) fundamentally erred by instructing the jury on first-degree premeditated murder where the evidence was allegedly legally insufficient to support a conviction for that offense. Finding no reversible error, we affirm.

**FACTS**

The defendant was charged with and convicted of: the first-degree murder of Steven Velez ("Velez") committed with a deadly weapon and with a premeditated design and/or while engaged in the perpetration of a robbery and/or a kidnapping (Count I); the kidnapping of Jose Manuel Martinez ("Martinez") with a firearm (Count II); the attempted armed robbery of Velez (Count III); falsely impersonating an officer (Count IV); giving a false name/identification after arrest (Count V); discharging a firearm from a vehicle (Count VI); and the aggravated assault of Martinez with a deadly weapon (Count VII). The charged offenses stem from the defendant's actions before, during, and after the attempted robbery of Velez—a drug supplier.

2

At trial, the State called several witnesses, including Michelle Lewis ("Ms. Lewis"), who participated in the crimes with the defendant but who had pled guilty to certain offenses; Martinez, the surviving victim; a neighbor who called 911; Ms. Alvarez; Detective Reid; Detective Casas; and Detective Ochoa. Their testimonies reflect the following.

The defendant and Ms. Lewis, a New York City Police Department administrative aide, drove to Miami Beach for a vacation. During their vacation, the defendant bought $5 worth of marijuana from Martinez. When the defendant told Martinez that he wanted to purchase two ounces of marijuana and half an ounce of cocaine, Martinez told the defendant that he would have to speak to Velez, who was Martinez's supplier. Martinez contacted Velez, and Velez and the defendant met and agreed to a price of $1500 for the drugs. The sale, however, was not consummated.

The following day, although the defendant did not actually have the money to purchase the drugs, he told Martinez that he had the money and asked him to come to his hotel. When Martinez entered the defendant's and Ms. Lewis's hotel room, the defendant pulled out a gun, pointed the gun at Martinez, showed Martinez a police identification card from New York, and identified himself as a New York City police officer. While holding Martinez at gunpoint, the defendant told Martinez that if he did not cooperate, he would put Martinez in jail. Martinez

3

told the defendant to go ahead and put him in jail. When Martinez refused to "cooperate," the defendant beat and threatened to kill Martinez, and at one point, the defendant placed a gun in Martinez's mouth and threatened to kill Martinez and Martinez's family.

After being threatened for two hours, Martinez agreed to call Velez and set up a meeting with the defendant. The defendant told Martinez to place the call on speaker phone, to speak English, and to tell Velez that the defendant had the money to purchase the drugs. Martinez called Velez, and Velez agreed to meet the defendant at Velez's home. With Ms. Lewis driving, the defendant seated in the front passenger seat, and Martinez in the backseat with the child safety locks engaged, they drove to meet with Velez.

After arriving at the designated site, Velez entered the backseat of the car with a Foot Locker bag that contained a shoebox with the drugs inside. After Velez showed the defendant the drugs, the defendant instructed Ms. Lewis to show Velez the New York City police identification, and the defendant told Velez, "[Y]ou're not going to get out of this one even if you want to get out of this one." When Velez learned that the defendant did not have the money to purchase the drugs, Velez tried to open the car door. When Velez realized that the door was locked from the inside, he stuck his hand outside of the car window and opened the door. As Velez was exiting the car, the defendant warned Velez not to get out of

4

the car, tried to grab the drugs from Velez, and shot Velez in the chest, in the back, and on his right side—with a two second break between the second and third shots. The medical examiner testified that one of the wounds was consistent with Velez being shot while in an upright position either turning or moving away from the defendant.

After the defendant shot Velez, Ms. Lewis drove away with Martinez still in the backseat. Martinez eventually jumped out of the window of the car and ran to a nearby church, where he made the following statement to Ms. Alvarez: "Oh my God, I just escaped from a murder. They killed my friend. They almost killed me so I had to run and I jumped from a running car."

Immediately after Velez was shot, a neighbor called 911. The 911 call reflects that Velez was in agony, was struggling to move, and had a lot of blood on both the back and the front of his body. Within three minutes of Velez being shot, Detective Reid arrived at the scene of the shooting and asked Velez who had shot him. In response, Velez stated: "A black man with dreads." Velez died within a few minutes of making this statement.

Following the shooting, the defendant and Ms. Lewis drove back to New York, but prior to leaving Miami Beach, the defendant threw the gun out of the car window while driving over a bridge. A few days later, the defendant and Ms. Lewis were arrested in New York, and Martinez positively identified both the

5

defendant and Ms. Lewis in separate photographic lineups.

The jury found the defendant guilty as charged, and he was later sentenced. The defendant's appeal followed.

**ANALYSIS**

**I. Whether the trial court abused its discretion by denying the defendant's motion for a mistrial based on the prosecutor allegedly pre-trying the case during voir dire**

The defendant contends that the trial court abused its discretion by denying his motion for a mistrial based on the prosecutor allegedly pre-trying the case during voir dire. See Salazar v. State, 991 So. 2d 364, 371 (Fla. 2008) (stating that an appellate court reviews a trial court's ruling on a motion for a mistrial for an abuse of discretion). Based on the following analysis, we find that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial as a mistrial was not necessary to ensure that the defendant received a fair trial. Id. at 372 (noting that a motion for a mistrial should only be granted when it is necessary to ensure that the defendant receives a fair trial).

The defendant focuses on three primary questions, statements, and/or topics addressed by the prosecutor during voir dire: (1) notifying the jury that law enforcement did not recover a gun, and thus, no gun would be produced at trial, and asking the prospective jurors if they could still convict without the gun being introduced; (2) informing the prospective jurors that Ms. Lewis, who participated

6

in the crimes with the defendant, had pled guilty and would be testifying as a State witness; and (3) telling the prospective jurors that they were going to hear from the surviving victim, and that he is a drug dealer. The law is clear, the State is prohibited from questioning "**prospective jurors as to the kind of verdict they would render under any given state of facts or circumstances.**" See Bell v. State, 108 So. 3d 639, 652 (Fla. 2013) (quoting Smith v. State, 253 So. 2d 465, 470 (Fla. 1st DCA 1971)) (emphasis added).

### A. *Law enforcement's failure to recover the gun*

During voir dire, the prosecutor asked the following question: "If the State proves to you beyond a reasonable doubt that a firearm was, in fact, used but we don't have it to show to you **would you still come back with a conviction**?" (emphasis added). By asking this question, the prosecutor improperly **attempted** to question the prospective jurors as to the verdict they would render based on certain facts relevant to the defendant's case—law enforcement's failure to recover the gun. This was improper. See Renney v. State, 543 So. 2d 420, 421 (Fla. 5th DCA 1989) (finding that it was improper for the prosecutor to ask the prospective jurors to commit to finding the defendant guilty if the State "prove[d] every element of the crime, but [did not] prove one particular fact").

Although the prosecutor's question was improper, we conclude that the trial court did not abuse its discretion by denying defense counsel's motion for a

7

mistrial as a mistrial was not necessary to ensure that the defendant received a fair trial. Our conclusion is based on the fact that defense counsel immediately objected; the trial court **sustained** the objection; the prosecutor's attempt to obtain a commitment from the prospective jurors was unsuccessful; and, after sustaining the objection, the trial court, as requested by defense counsel, gave the prospective jurors a curative instruction. Thus, although the prosecutor's unanswered question was an improper attempt to pre-try the case, the error was harmless, and therefore, the trial court correctly denied the defendant's motion for a mistrial.

B. _Informing the prospective jurors of Ms. Lewis's participation in the charged crimes and subsequent plea_

The defendant also takes issue with the prosecutor's statements during voir dire regarding Ms. Lewis. The prosecutor informed the prospective jurors that Ms. Lewis: was the defendant's ex-girlfriend; participated in the crimes with the defendant; had since cooperated with the State and had taken a plea; is a convicted felon; and would be called by the State as a witness. After informing the prospective jurors of Ms. Lewis's background, the prosecutor asked them if they would automatically not believe her because she is a convicted felon or if they would be willing to evaluate her testimony as they would any other witness. Importantly, the prosecutor did not ask the prospective jurors if they could or would convict the defendant based on the testimony of a cooperating witness or a convicted felon if the State proved its case beyond a reasonable doubt. Rather, the

8

prosecutor's question was a permissible attempt to determine if the prospective jurors had any latent or concealed prejudgments as to cooperating witnesses and/or a witness who is a convicted felon.  See Mendez v. State, 898 So. 2d 1141, 1143 (Fla. 5th DCA 2005) (noting that "[t]he purpose of voir dire is to ensure a fair and impartial jury"; holding that a trial court "must allow counsel the opportunity to ascertain latent or concealed prejudgments by prospective jurors") (quoting Miller v. State, 683 So. 2d 600, 602 (Fla. 2d DCA 1996)); see also Figueroa v. State, 952 So. 2d 1238, 1239 (Fla. 3d DCA 2007) ("While the trial court certainly has the discretion . . . to preclude attorneys from pre-trying their cases or in obtaining a commitment on ultimate issues to be decided after hearing all the evidence, a trial judge must allow counsel to ascertain latent or concealed prejudgments by prospective jurors."). Thus, the question posed by the prosecutor was not improper, and the defendant's motion for a mistrial was properly denied.

>    *C. Informing the prospective jurors that they were going to hear from the surviving victim and that he is a drug dealer*

The defendant contends that the prosecutor's statement to the prospective jurors that they "will also hear from another witness who is a surviving victim who was a drug dealer," was improper, requiring a mistrial.  However, the record reflects that immediately following this statement, and before the prosecutor could ask the jurors any questions regarding this information, the trial court called the prosecutor and defense counsel sidebar.  Following the sidebar, the trial court

9

instructed the prospective jurors on how to weigh the credibility of a witness. The trial court told the prospective jurors that some of the factors they should consider are: whether the witness had some interest in how the case should be decided; whether the witness had been offered or received any preferred treatment or benefit for his testimony; and whether the witness is a convicted felon. The trial court also instructed the prospective jurors that they should consider the testimony of a cooperating witness with more caution than the testimony of other witnesses; however, if the cooperating witness's testimony convinced them of the defendant's guilt beyond a reasonable doubt, then the defendant should be found guilty. After providing this instruction, the trial court questioned the prospective jurors as to whether, after explaining the law to them, they had any concerns.

We commend the trial court in the close attention it paid to the questioning, its quick and proactive responses, and its textbook-perfect handling of this issue thereby thwarting any possible attempt by the prosecutor to pre-try the case. Based on the trial court's quick reaction, the prosecutor was never given an opportunity to ask the prospective jurors for any sort of commitment, and based on the trial court's immediate instructions as to the law, the complained-of statement did not prejudice the defendant or require a mistrial.

**II. Whether the trial court abused its discretion by precluding the defense from cross-examining the lead detective regarding his pending criminal charges**

The defendant contends that the trial court abused its discretion by not permitting defense counsel to cross-examine Detective Ochoa about his pending criminal charges in order to probe his possible bias, motive, or self-interest regarding his trial testimony. We agree with the defendant that this was error.

Detective Ochoa had pending criminal charges in Broward County for sexual battery of a minor. The charges against Detective Ochoa were filed approximately two years after he had arrested the defendant, and the charges filed against Detective Ochoa were completely unrelated to the defendant's case.

Section 90.608, Florida Statutes (2016), provides that "[a]ny party, including the party calling the witness, may attack the credibility of a witness by: . . . (2) Showing that the witness is biased." Although a defense witness may be impeached only by proof of convictions, "if a witness for the State were presently . . . under actual . . . criminal charges . . . , a person against whom such witness testifies in a criminal case has an absolute right to bring those circumstances out on cross-examination." Breedlove v. State, 580 So. 2d 605, 607-608 (Fla. 1991) (quoting Fulton v. State, 335 So. 2d 280, 283-84 (Fla. 1976) (quoting Morrell v. State, 297 So. 2d 579, 580 (Fla. 1st DCA 1974)) (internal quotation marks omitted). Such cross-examination is permitted "so that the jury will be fully apprised as to the witness' possible motive or self-interest with respect to the testimony he gives." Morrell, 297 So. 2d at 580. As explained in Morrell:

11

> Testimony given in a criminal case by a witness who himself is under actual or threatened criminal investigation or charges may well be biased in favor of the State without the knowledge of such bias by the police or prosecutor **because the witness may seek to curry their favor with respect to his own legal difficulties by furnishing biased testimony favorable to the State**.

Morrell, 297 So. 2d at 580 (emphasis added).

This Court's decision in Bell v. State, 614 So. 2d 562 (Fla. 3d DCA 1993), reflects that the trial court, within limits, should have allowed the defense to cross-examine Detective Ochoa regarding his pending criminal charges. In Bell, the State's witness, Otis Charles, had pending charges against him at the time of trial, charges which were completely unrelated to the charges against defendant Bell. Id. at 563. During cross-examination, defense counsel attempted to ask Charles several questions regarding the pending charges, but Charles refused to answer on the ground that if he answered the questions, he might incriminate himself. Id. Bell argued on appeal that the trial court erred by not requiring Charles to answer the following two questions: (1) "Is it a fact, Sir, you are currently incarcerated facing trial for an indictment charging you with the following crime[s]: Murder in the first degree, and attempted first degree murder-isn't that a fact, Sir?" and (2) "Isn't it a fact, Sir, that you hope to gain favor with the very state attorney's office that is prosecuting this case in order to help yourself with your pending charges." Id.

This Court held that the trial court erred by not requiring Charles to answer

these questions because the answers to these questions would not have incriminated Charles.  Id.  Specifically, the answer to the first question was a matter of public record, and the answer to the second question would not have subjected Charles to criminal prosecution.  Relying on Breedlove and other cases, this Court determined that the questions "were extremely relevant to Charles' credibility and were the proper subject of cross-examination," and therefore, the trial court should have required Charles to answer the questions.  Id. at 563-64; see also Carlyle v. State, 945 So. 2d 540, 546 (Fla. 2d DCA 2006) (holding that the defense should have been permitted to cross-examine the witness as to a pending probation violation because a "defendant has the absolute right to fully cross-examine adverse witnesses to discredit them by showing bias, prejudice, interest, or possible ulterior motive for testifying") (internal quotation omitted); Douglas v. State, 627 So. 2d 1190, 1191 (Fla. 1st DCA 1993) ("When charges are pending against a prosecution witness at the time he testifies, the defense is entitled to present this fact to the jury to show bias, motive or self-interest.").  Thus, in Bell, this Court found that the trial court abused its discretion by limiting defense counsel's cross-examination of Charles.

Although we conclude that the trial court abused its discretion by not permitting the defense to cross-examine Detective Ochoa regarding his pending criminal charges, we conclude that the error was harmless beyond a reasonable

13

doubt. Any error in curtailing cross-examination of a State witness could be harmless error based on "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Livingston v. State, 565 So. 2d 1288, 1291 (Fla. 1988) (quoting Delaware v. Van Arsdall, 475 U.S. 673 (1986)). Following our review of the record, including the overwhelming strength of the prosecution's case, which will be addressed in the following sections, we conclude that the error was harmless beyond a reasonable doubt.

**III. Whether the trial court abused its discretion by allowing the State to introduce a statement made by the homicide victim just before he died**

Within three minutes of Velez being shot, Detective Reid arrived at the scene of the shooting and asked Velez who had shot him. In response, Velez stated: "A black man with dreads." Recognizing that Velez's statement was hearsay, the State sought to admit Velez's statement under both the excited utterance and the dying declaration exceptions to the hearsay rule. The trial court found that the statement was admissible under both exceptions to the hearsay rule.

The defendant contends that the trial court abused its discretion by admitting Velez statement under both exceptions to the hearsay rule. As the statement was properly admitted under both the excited utterance exception and the dying

14

declaration exception to the hearsay rule, we conclude that the trial court did not abuse its discretion by admitting the statement.

### A. *Excited Utterance—Section 90.803(2) of the Florida Statutes*

As explained by the Florida Supreme Court, for a statement to qualify as an excited utterance under section 90.803(2) of the Florida Statutes, the following essential elements are necessary: "(1) there must be an event startling enough to cause nervous excitement; (2) the statement must have been made before there was time to contrive or misrepresent; and (3) the statement must be made while the person is under the stress of excitement caused by the event." State v. Jano, 524 So. 2d 660, 661 (Fla. 1988); see also Beckman v. State, 230 So. 3d 77, 90 (Fla. 3d DCA 2017). "An excited utterance is admissible as an exception to the hearsay rule because the declarant does not have the reflective capacity necessary for conscious misrepresentation. Thus, statements made by someone who is excited are spontaneous and have sufficient guarantees of truthfulness." Rogers v. State, 660 So. 2d 237, 240 (Fla. 1995) (citing Charles W. Ehrhardt, *Florida Evidence* § 803.2 (1994 ed.)).

As to the first prong, there was clearly an event startling enough to cause nervous excitement—Velez had been shot three times. As to the second prong, the statement was made before there was time for Velez to contrive or misrepresent. The evidence showed that Detective Reid arrived at the scene of the

shooting within three minutes of Velez being shot three times. Prior to Detective Reid's arrival, one of Velez's neighbor called 911. The 911 call reflects that Velez was in agony, was struggling to move, and had a lot of blood on both the back and the front of his body. Finally, as to the third prong, given Velez's physical and mental condition at the time he made the statement to Detective Reid, it is clear that Velez made the statement while under the stress of excitement caused by the event. Thus, the trial court did not abuse its discretion by admitting the statement as an excited utterance.

B. *Dying Declaration—Section 90.804(2)(b) of the Florida Statutes*

Although we have concluded that the statement was properly admitted as an excited utterance pursuant to section 90.803(2), we also conclude the trial court did not abuse its discretion by determining that the statement qualified as a dying declaration admissible under section 90.804(2)(b).

In order for the dying declaration exception to apply, "the deceased must have known and 'appreciated his condition as being that of an approach to certain and immediate death,' although it is not necessary that the declarant 'make express utterances' that he would never recover." Hayward v. State, 24 So. 3d 17, 30 (Fla. 2009) (quoting Henry v. State, 613 So. 2d 429, 431 (Fla.1992)). As discussed above, the evidence showed that immediately after being shot three times, Velez was in agony, was struggling to move, he was bleeding profusely, and he died

16

within minutes of being shot. Thus, based on the totality of the circumstances, the trial court properly determined that Velez's statement qualified as a dying declaration.

**IV. Whether the evidence was legally sufficient to support a jury instruction on premeditated murder**

Although the defendant lodged no objection below, he contends the trial court fundamentally erred by instructing the jury on premeditated murder because he contends that the evidence was legally insufficient to support a conviction for first-degree premeditated murder. The defendant further contends that, because the general verdict form did not require the jury to specify which alternative theory of first-degree murder it was relying on in finding the defendant guilty—premediated murder and/or felony murder—the jury may have relied on the legally insufficient theory of first-degree premediated murder. As the evidence presented by the State was legally sufficient to establish that the defendant's murder of Velez was premeditated, we find no error.

Premeditation "is a fully formed conscious purpose to kill," which "may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." Wilson v. State, 493 So. 2d 1019, 1021 (Fla. 1986), receded from on other grounds, Evans v. State, 838 So. 2d 1090 (Fla. 2002)). Premeditation may be established by direct and/or circumstantial evidence. Circumstantial evidence of

17

premeditation includes "the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Spencer v. State, 645 So. 2d 377, 381 (Fla. 1994).

In the instant case, the State presented more than sufficient evidence of premeditation as to the charged offense of the first-degree murder of Velez. The evidence showed that the defendant intended to take the drugs from Velez without paying for them. Although the defendant's scheme to rob Velez, standing alone, does not show premeditation to commit murder, the evidence presented at trial demonstrates that the defendant intended to obtain the drugs at all costs—even murdering unwilling participants. The defendant held Martinez at gunpoint at the hotel room, threatened to kill him and his family, beat him, and, at one point, put the gun inside of Martinez's mouth and threatened to kill him. The defendant continued to threaten to kill Martinez during the drive to Velez's home. He activated the child safety locks and warned Martinez that he would shoot him if he attempted to exit the vehicle. After Velez entered the vehicle, the defendant told Velez: "[Y]ou're not going to get out of this one even if you want to get of this one." When Velez reached through the car door window and opened the locked backseat car door to escape, the defendant warned him not get out of the car and when he ignored the defendant's warning, the defendant shot Velez three times—

18

(1) in the chest, (2) on Velez's right side, and (3) in the back, as Velez was attempting to flee. Importantly, there was a two-second break between the second and third shots, and one of the shots was consistent with Velez being in an upright position either turning or moving away from the defendant. Additionally, after the defendant shot Velez, the defendant continued to threaten to shoot Martinez if he tried to escape.

Based on the evidence presented, the State clearly introduced sufficient evidence to support a finding of premeditation when the defendant killed Velez— "a fully formed conscious purpose to kill" that "exist[ed] for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." Wilson, 493 So. 2d at 1021. Accordingly, the trial court did not err, let alone fundamentally err, by instructing the jury on first-degree premeditated murder.

## CONCLUSION

Based on the above analysis, we find no reversible error. Accordingly, we affirm the defendant's convictions and sentences.[1]

---

[1] The remaining arguments raised by the defendant lack merit and will not be discussed in this opinion.